HENRY LEMBKE, Appellee, v. GEORGE LEMBKE et al., Appellants.

**EASEMENTS: Extent of Right—Nonrevocability.**   A landowner who causes his adjoining landowner to purchase an inaccessible tract of land, under the promise that the latter may have a passageway over the land of the former to said inaccessible tract, and later

acquiesces for many years in the use of such passageway by said
purchaser, may not recall or revoke the license so long as the pur-
chaser retains title to both tracts of land.

*Appeal from Pottawattamie District Court.*—E. B. WOODRUFF,
Judge.

JUNE 22, 1923.

SUIT in equity, to enjoin trespass upon real property. The
real controversy is made to appear in the answer and reply. The
controversial question there presented was whether the inter-
vener, Charles Lembke, had acquired from the plaintiff either
an easement or an irrevocable license for a right of way over
the corner of plaintiff's land. The decree found this issue with
the plaintiff, and ordered a permanent injunction against the
defendant, enjoining him from the further use of such alleged
right of way. The defendant appeals.—*Reversed.*

*Preston & Dillinger,* for appellants.

*W. C. Bryant,* for appellee.

EVANS, J.—Plaintiff, Henry Lembke, and intervener,
Charles Lembke, are brothers. They are the owners of adjoining
lands, which formerly they had occupied as neighbors, for many
years. Originally, their adjoining lands comprised the north-
east quarter of a certain Section 13. Henry owned the east
half thereof, and Charles, the west half thereof. About 1898 or
1899, Charles Lembke purchased the east half of the southeast
quarter of said Section 13, known in the record as the Newberry
80. It will be noted that the Newberry land joins the plaintiff's
land on its south line, whereas it only corners with the 80-acre
tract of Charles Lembke, its purchaser. The following diagram
will be an aid to an understanding of the evidence:

George Lembke, defendant, is a son of Charles Lembke's,
and is in possession of all the land of Charles Lembke herein
involved. As to a part of such, he is in possession under a con-
tract of purchase; and as to the remainder thereof, he is in
possession as a lessee, and as an optionee to purchase.

The testimony on behalf of the defendant and intervener
was that, before purchasing the Newberry 80, Charles Lembke

sought an understanding with his brother as to acquiring a right of way over the corner of his brother's land, which should connect the land which he proposed to purchase with the land which was then owned and occupied by him. The plaintiff advised him to buy the land, and freely offered him the right of way over the corner of his land. The plaintiff had no pecuniary interest in the purchase nor in the creation of a right of way, except possibly an indirect one, in that the Newberry land was said to be overrun with noxious weeds, which both Henry and Charles greatly desired to eliminate from any contiguity with their lands. Relying upon Henry's promise of the right of way through his land, Charles bought the Newberry land, and thereafter took possession of the right of way by running a diagonal fence across the corner, as indicated in the above plat. A point two rods north of the true southwest corner of plaintiff's land and another point two rods east thereof form the termini of this diagonal fence. From the corner post to the center of the diagonal fence, he installed a gate. The only function of this gate was one solely for the use of Charles Lembke. It served to keep the stock confined within either tract. Charles Lembke testified to two or three conversations on the subject with his

brother Henry. One of these conversations was had at or about the place of the proposed right of way. August Lembke, a son of Charles Lembke's, was present at this time, and testifies in corroboration of his father. Plaintiff's denial of these conversations is qualified to such an extent as to leave him very narrow ground upon which to stand. The numerical weight of the evidence is against him. But we would not lay undue stress upon this fact, were it not for the corroboration afforded by the record to the defendant and the intervener. The following from the testimony of plaintiff as a witness is sufficiently illustrative of the nature and extent of his denial.

"I had a talk with Charles Lembke about a roadway across my farm at the southwest corner. The conversation was about a mile north of Griswold, after I had lived there for four years. There was no conversation had near the place in dispute, as testified here,—nothing of the kind whatever. It is ridiculous. I never had any such conversation where I urged him to buy the farm, and that, if he would buy it, I would give him a roadway across there. One time, he came with his wife, for the very purpose to get permission, and I told him he could go across the corner of the farm. I told him that they should make two gates, a gate for each line fence, and to swing them on their side of the line whenever they went through, so they would not antagonize my renters. I gave him permission to cross the corner of my land there. It is on a certain provision that he keep those gates and not interfere with my renters, and not intended for anybody else,—simply for his boys or others that was working for him; and that he should pay attention to them, and see that they would not interfere with them. In about six years, the renter I had then made complaint that George Lembke would swing the gates in towards my field. I thought I would let that go. I never executed any writing giving that roadway across there. I just done it like a neighbor would say to another, 'Why, you can go across there.' * * * In 1912, I told Charles Lembke that I had been pestered so much there that he couldn't use this [roadway] any more."

On cross-examination, he testified:

"I gave my brother the right to open that fence and go through there. I knew he was going through there and using

this as a driveway during the last twenty years. I knew he constructed a driveway there,—at least he told me so. * * * I knew I had given him the right to go through there. I know that cattle or anything else couldn't get on my farm with a fence across the corner there and a gate between the corner and the fence. If they left the gate open, cattle or horses or hogs or anything else couldn't go any place except on their own land. My tenants were complaining that they were throwing the fence into the field. I think they were complaining about swinging the gates onto my land. They were not complaining because the fence had cut off about four square rods of my land.''

The defendant used this driveway from the fall of 1898 or 1899 until February 28, 1921. There was a temporary interference with his possession in 1912, when the diagonal fence was removed, and was replaced by the defendant within a few hours. From that time, acquiescence continued down to the beginning of this suit. It will be noted from plaintiff's testimony as a witness that he claimed to have granted the right of way on condition that the gates should be swung so as to open upon the land of the intervener, and not upon the plaintiff's land; and further, that his reason for withdrawing his promise was that the plaintiff's renters had been ''pestered'' by the encroachment of the gates upon the land of plaintiff. The method of setting off the ground for the right of way that was adopted by the defendant was so adopted immediately. No gates whatever were constructed in the diagonal fence. The only gate constructed was one for the defendant's own use. No complaint was ever made by plaintiff to his brother of the manner of cutting off the right of way. There was no ''pestering'' in fact of his tenants, though such was the reason given by him for changing his attitude. Computation shows that the quantity of land occupied for the right of way was exactly two square rods, which is the equivalent of one-eightieth part of an acre. The claim of plaintiff in his evidence that he imposed a condition upon the intervener to the effect that he should swing two gates from the southwest corner post, each of which should open upon the intervener's land, is not at all persuasive, in the light of all the admitted circumstances. Such a condition would presuppose that no stock was to pass over such right of way. There is no claim that such

prohibition of stock was agreed on in terms. On the contrary, the evidence for the intervener was, in substance, that the right of way was to be wide enough for all convenient use upon the farm. It was to be wide enough to take a binder and a hay-rack over it. The intervener began to use it immediately for all ordinary uses, including the driving of stock from one tract to the other. Manifestly, nothing less than this would satisfy the demands of practical farming. This part of intervener's evidence was not denied by the plaintiff, nor does it appear that any objection was ever made by plaintiff to the use of the driveway for the passing of stock. If the method of access to the right of way was to be two gates, swung upon the southwest corner post, then, manifestly, plaintiff's growing crops upon his own land would be menaced every time that any stock should be driven through such two gates. It would require a force of two or three men to be present at every passing of stock. Even so, in the season of tall corn, animals might readily escape, and be lost in the cornfield. Such possibilities would be self-evident at the time the agreement between the parties was made. Nothing less practicable could be suggested than the alleged conditions which plaintiff claims to have interposed upon the intervener. To our minds, the probabilities are quite overwhelming that no such condition was ever attached. The method actually adopted by the intervener afforded absolute protection against the escape of stock upon the plaintiff's land, and confined the intervener strictly to the use of the particular two square rods which constituted the right of way. That the plaintiff should have acquiesced so long in the method actually adopted by the intervener is persuasive evidence that he himself deemed it proper and adequate.

We see no escape from holding that the weight of the evidence sustains the contract as claimed by the defendant.

The trial court included in its decree a finding of facts which did not affirmatively contradict the material evidence for the defendants. It appears therefrom, however, that the trial court did not regard as material the question whether plaintiff's agreement was made *prior* to the purchase of the Newberry land or *after,* and it made its finding in the alternative on the question of time. We think this probably accounts for the finding

of the court adverse to the defendants. Treating the conversation of the parties as transitory and without any consideration, the finding of the court that only a revocable license was intended was quite natural. If, however, the agreement was made *before* the purchase of the Newberry land, and if the purchase was made in reliance upon the agreement, and plaintiff knew that it was about to be made upon such agreement, a different situation is presented. We think that the question of whether the agreement was made before the purchase or was made afterward is a very material one. That it was made before the purchase of the Newberry land is virtually undisputed. The plaintiff in his own evidence does not claim otherwise, although he does deny the earlier conversations testified to by the defendant. He fixes the time of the conversation conceded by him as being four years after he had moved to Griswold. He claims to have moved to Griswold in 1894. There is nothing in this testimony that is inconsistent with the intervener's claim that the agreement was made *before* he bought the Newberry land. The circumstances under which the agreement was made tend strongly to negative the idea that it was to be temporary or revocable. The importance of the agreement to the intervener was very great, in the event that he should buy the Newberry land. Under the circumstances appearing in the record, it necessarily operated as an important inducement to the purchase. The intervener's farm improvements were at the north end of his farm then owned by him. There were no improvements upon the Newberry land. The Newberry land was not otherwise accessible to the intervener in connection with his own land, except by a circuit of two and one-fourth miles of travel on the highway. There was no highway along the east line of Section 13, which was a township line. The only way whereby the intervener could reach the land from his own farm would be to go west for half a mile, then south one mile, and east three fourths of a mile. This would bring him to the south end of the Newberry land. At the time this controversy arose, the defendant had 70 acres of pasture on the Newberry land. All his facilities for housing, watering, and yarding were upon the home 80.

It will be readily seen, therefore, that the use of this little corner right of way was of very great importance to the defend-

ant and the intervener, and was of very slight value to the plaintiff.

Inasmuch, therefore, as the agreement itself operated as a substantial inducement to the intervener to purchase the Newberry land, and inasmuch as he did purchase it in reliance thereon, and as the plaintiff knew that he was relying thereon in the making of such purchase, and inasmuch as he took immediate and exclusive possession of the right of way thus agreed upon, and such exclusive possession was acquiesced in for at least 14 years, without objection, it cannot be said that the agreement was invalid, as being within the statute of frauds, or as being without consideration; nor can we say that there was any lack of substantial proof of the oral agreement.

Whether the agreement amounted to an irrevocable or executed license, or whether it amounted technically to an easement, is not material to the present decision. The practical distinction between the two is very slight. See *Ruthven v. Farmers Co-op. Creamery Co.*, 140 Iowa 570; *Arbaugh v. Alexander*, 151 Iowa 552; *Green v. Crain*, 185 Iowa 1086.

The license or the easement, whichever it may be, is not necessarily permanent. It is necessarily incident to the continued ownership or occupancy of these two tracts of land by the same person. It will automatically cease whenever this relation in the ownership and occupancy of these two tracts ceases. That it should continue until such time and cease at such time is consistent with the manifest intention of the parties at the time the agreement was made. The intervener could not reasonably have expected more, nor the plaintiff have intended less. We are constrained, therefore, to disapprove the decree entered below, and it is accordingly reversed.—*Reversed.*

STEVENS, ARTHUR, and FAVILLE, JJ., concur.